OPINION OF THE COURT
AMBRO, Circuit Judge
The City of Philadelphia has a written policy preventing private advertisers from displaying non-commercial content at the Philadelphia International Airport. The City, which owns the Airport, says the policy helps it further its goals of maximizing revenue and avoiding controversy. The record, however, reveals substantial flaws in those justifications. The City acknowledges the flaws but nonetheless maintains that the ban on non-commercial ads is a reasonable use of governmental power. It is not. Because the ban is unreasonable, it violates the First Amendment and cannot be enforced as written. The District Court reached the same conclusion, and we therefore affirm.
*438 I. Background

A. The City’s policy-

The City has long accepted paid advertisements that are posted in display cases and on screens throughout the Airport. In January 2011, -the National Association for the Advancement of Colored People submitted an ad for display at the Airport. It offered to pay the prevailing market rate for the ad, which read: “Welcome to America, home to 5% of the world’s people & 25% of the world’s prisoners. Let’s build a better America together. NAACP.org/smartandsafe.” At the time the City did not have a written policy governing the types of ads it would display at the Airport. It nonetheless rejected the submission based on an informal practice of only accepting ads that proposed a commercial transaction.
The NAACP filed a lawsuit in October 2011 claiming that the City’s rejection of its ad violated the First Amendment and seeking declaratory and injunctive relief. In March 2012, while the lawsuit was pending, the City adopted the written policy now before us. It states that ads that do not “propose a commercial transaction” cannot be approved. “[Commercial transaction” is not defined. Other categories of ads that cannot be displayed are those: 1) “relating to the sale or use of alcohol or tobacco products”; 2) containing “sexually explicit representations and/or relating] to sexually oriented businesses or products”; and 3) “relating to political campaigns.” There is an exception that allows the City to post non-commercial ads promoting subjects that include Philadelphia tourism, City initiatives, air service, and use of the Airport. The policy only covers the Airport’s advertising space. In other areas of the Airport, travelers see a wide range of non-commercial content. For instance, there are televisions and newsstands throughout, often in close proximity to ads governed by the policy.
The City argues that the ban on noncommercial content[1] maximizes revenue and avoids controversy. Specifically, it maintains that displaying non-commercial ads, which might relate to religious or social issues, could jeopardize revenue from companies that do not want their content posted near potentially divisive messages. Similarly, the City contends that accepting non-commercial ads might expose travelers to content they find offensive.
In connection with the adoption of the written policy, the City agreed to display the NAACP’s ad for three months and to pay the organization $8,800 in attorney’s fees. The parties also agreed that the NAACP would file an amended complaint to challenge the newly adopted policy. It did so in August 2012. The amended complaint presents a facial challenge to the ban on non-commercial content. There is no challenge to any other portion of the policy.
B. Deposition testimony
As part of discovery in the lawsuit, the NAACP deposed James Tyrrell, the Airport’s Deputy Director of Aviation and Property Management/Business Development. The City designated Tyrrell, pursuant to Federal Rule of Civil Procedure 30(b)(6), to testify on its behalf on numerous topics, including the “reason or purpose and the factors considered by the City for its decision to adopt, create, enact or promulgate the [written policy], and any communications concerning that decision.” Despite this designation, Tyrrell could not offer any conclusive explanation for why *439 the City adopted the ban on non-commercial content. Indeed, asked whether he had “an understanding” of the reason for distinguishing between commercial and noncommercial ads, he responded that he did not.
Because the City defends the ban on the grounds of revenue maximization and controversy avoidance, Tyrrell’s testimony on these points merits a detailed discussion. With respect to revenue, he said that the purpose of allowing advertising in the Airport is to make money. He had two opportunities during his deposition to discuss any connection that might exist between the ban and this goal. First, when asked specifically about the NAACP’s ad, Tyrrell testified that it was not “consistent with the message that the [AJirport wants to deliver in terms of promoting tourism, promoting the region and making it a very hospitable place. Advertisers look at that as well.” However, asked whether he had any reason “beyond the realm of conjecture and speculation” to think that displaying the ad might cost the Airport revenue, Tyrrell conceded that he did not.
On the second occasion, Tyrrell disowned the notion that the policy was motivated by revenue concerns. The following exchange is particularly instructive:
Q [by Fred Magaziner, attorney for NAACP]: In determining that it was prudent and the time had come to adopt [the written] policy, was one of your purposes to prevent loss of revenue from commercial advertisers?
[Objection]
A [by Tyrrell]: No.
Q: And that distinction that the policy draws between [commercial and noncommercial ads], that has nothing to do with revenue; correct?
A: I do not believe so, no.
Q: You do not believe it has anything to do with revenue?
A: No.
As part of that same exchange, he also suggested that the policy might even cost the City money because it forces the Airport to turn away willing advertisers. Asked whether he would be “happy” from a business perspective selling noncommercial ads, he said that he would be.
Meanwhile, Tyrrell also offered testimony relevant to the theme of avoiding controversy. Though that term can mean many things, his testimony sharply limited the possibilities. For instance, one possible meaning might be that the City is concerned about the risk of attribution if it permitted non-commercial ads to be displayed. In particular, it might be worried that passersby would assume that the City, which owns the advertising space, endorses the views of non-commercial advertisers. But Tyrrell testified that he had no reason to believe that the ban had anything to do with maintaining a neutral position for the City on issues of noncommercial speech. Another possibility might be that the ban, under which all noncommercial ads are rejected, prevents the City from playing favorites by accepting messages it likes while turning away ones it does not. Yet, asked if avoiding the appearance of favoritism or minimizing the chances for abuse motivated the ban, Tyr-rell said that he did not have any reason to think so. He gave the same answer when asked whether the ban related to a desire not to impose on captive audiences (ie., people who are in the Airport by necessity and cannot avoid the messages merely by going somewhere else).
The only possibility not eliminated was that noncommercial ads might be more likely than commercial ones to offend travelers. This is the theory the City advances on appeal. Tyrrell testified that this “may” have something to do with the adoption of the ban. However, he said that he did not *440 recall if this idea had “ever been discussed in any meeting or conversation” that he had. And he admitted it was something he just thought of as he sat for his deposition.
Finally, Tyrrell, on a general level, described the Airport as a “very stressful” place in light of the commotion and anxiety that frequently accompany travel. As a result, management makes “a very concentrated and huge effort to keep everything positive, everything non-controversial, and just create an environment that is soothing and pleasing.”

C. The City’s position

The City initially argued (at least in its briefing) that its subjective intentions in adopting the ban were to maximize revenue and avoid controversy. See Appellant’s Br. at 17-18. By the time of oral argument, however, it relied almost exclusively on the contention that its “actual thoughts and thinking” on the subject “don’t matter.” Oral Arg. Tr. at 7. The City also maintained that Tyrrell’s testimony about the ban was irrelevant. Id. at 18 (“I don’t think it matters what the witness says.”). Moreover, it agreed that the reasons it was offering — revenue maximization and controversy avoidance — might be after-the-fact justifications that are “strictly in the realm of lawyer argumentation.” Id. at 55; see also id. at 16-17 (asked if the City can invent justifications when writing its appellate briefs, counsel for the City answered yes). The City further conceded the possibility that its actual intent might have been to suppress viewpoints that cast Philadelphia or the region in a negative light. Id. at 16 (noting that its intent “might have been viewpoint discriminatory”).
II. Jurisdiction and Standard of Review
The District Court had jurisdiction over the NAACP’s First Amendment claims under 28 U.S.C. §§ 1331 and 1343. It issued two opinions. In the first it granted summary judgment to the NAACP. NAACP v. City of Philadelphia, 39 F.Supp.3d 611, 635 (E.D. Pa. 2014). And in the second it granted the NAACP declaratory relief and an injunction preventing the City from enforcing the ban as written. NAACP v. City of Philadelphia, Civ. No. 11-6533, 2014 WL 7272410, at *3 (E.D. Pa. Dec. 19, 2014). Per 28 U.S.C. § 1291, we have jurisdiction over the timely appeal of the latter ruling.
Our review is plenary. See Aleynikov v. Goldman Sachs Group, Inc., 765 F.3d 350, 357 n.2 (3d Cir. 2014).(“Ordinari-ly we review a district court’s grant of an injunction for abuse of discretion. But where ... the injunction results [from] a summary judgment motion, our review is plenary.”) (internal citation omitted); Borden v. Sch. Dish of Twp. of E. Brunswick, 523 F.3d 153, 174 n.17 (3d Cir. 2008) (plenary review over questions of law in connection with declaratory judgment actions).
Granting summary judgment “is appropriate if ... there is no genuine issue as to any material fact and ... the movant is entitled to judgment as a matter of law.” State Auto Prop. & Cas. Ins. Co. v. Pro Design, P.C., 566 F.3d 86, 89 (3d Cir. 2009) (internal quotation marks omitted). Additionally,
[although the non-moving party receives the benefit of all factual inferences in the court’s consideration of a motion for summary judgment, the non[-]moving party must point to some evidence in the record that creates a genuine issue of material fact. In this respect, summary judgment is essentially ‘put up or shut up’ time for the non-moving party: [it] must rebut the motion with facts in the record and cannot rest solely on assertions made in the pleadings, legal memoranda, or oral argument.
*441 Berckeley Inv. Group, Ltd. v. Colkitt, 455 F.3d 195, 201 (3d Cir. 2006) (internal citation omitted).
III. Discussion
Our analysis proceeds in five parts. We begin with a discussion of the nature of the public property at issue. After laying that groundwork, we analyze who must bear the burden of proof. We then address the standards for meeting that burden. Neict we apply the framework to our facts. Finally, we consider and reject a counterargument to our holding.

A. Forum, analysis

Because this case involves a restriction on the types of speech allowed on public property, we begin with forum analysis. Though often complicated in practice, this analysis stems from a simple premise — not every public property is the same, and different types of property will require different treatment. As a result, the Supreme Court has grouped public properties along a spectrum.
On one end of the spectrum, we have traditional public forums. These properties, which include public streets and parks, “have immemorially been held in trust for the use of the public, and, time out of mind, have been used for purposes of assembly, communicating thoughts between citizens, and discussing public questions.” Perry Educ. Ass’n v. Perry Local Educators’ Ass’n, 460 U.S. 37, 45, 103 S.Ct. 948, 74 L.Ed.2d 794 (1983) (internal quotation marks omitted). Content-based speech restrictions in traditional public forums get strict scrutiny, which means that the government must show a compelling state interest and narrow tailoring of measures to achieve that interest (including the absence of less restrictive alternatives). Id.
In the middle, we have designated public forums. These are properties that have “not traditionally been regarded as a public forum [but are] intentionally opened up for that purpose.” Pleasant Grove City v. Summum, 555 U.S. 460, 469, 129 S.Ct. 1125, 172 L.Ed.2d 853 (2009). As with traditional public forums, content-based restrictions get strict scrutiny. Id. at 469-70, 129 S.Ct. 1125.
The final category is sometimes called a. limited public forum and other times labeled a nonpublic forum. It is reserved for government properties that have not, as a matter of tradition or designation, been used for purposes of assembly and communication. These enjoy the least protection under the First Amendment. Content-based restrictions are valid as long as they are reasonable and viewpoint neutral. See id. at 470, 129 S.Ct. 1125; Cornelius v. NAACP Legal Def. & Educ. Fund, Inc., 473 U.S. 788, 800, 105 S.Ct. 3439, 87 L.Ed.2d 567 (1985).[2] Unlike with strict scrutiny, this review does not require narrow tailoring or the absence of less restrictive alternatives. Indeed, the “Government’s decision to restrict access ... need only be reasonable; it need not be the most reasonable or the only reasonable limitation.” Cornelius, 473 U.S. at 808, 105 S.Ct. 3439 (emphasis in original). Moreover, the government’s asserted interest in drawing content-based distinctions must be valid, but it does not have to be compelling. K.A. ex rel. Ayers v. Pocono Mountain Sch. Dist., 710 F.3d 99, 106 (3d Cir. 2013).
Here the relevant forum is the Airport’s advertising space (rather than the Airport *442 in its entirety) because that is the specific public property that the NAACP seeks to access. See Cornelius, 473 U.S. at 801, 105 S.Ct. 3439 (noting that in “defining the forum we have focused on the access sought by the speaker”); see also Christ’s Bride Ministries, Inc. v. Se. Pennsylvania Transp. Auth., 148 F.3d 242, 248 (3d Cir. 1998) (in case involving challenge to rejection of advertisements, defining forum as public transit system’s advertising space rather than entirety of transit system). The District Court concluded that the advertising space is a limited public/nonpublic forúm. NAACP, 39 F.Supp.3d at 627.
We assume, without deciding, that the Court was correct.[3] That is because our conclusion that the ban on noncommercial content is unreasonable means that it is unconstitutional no matter what we label the forum. In other words, rea.sonableness is a bare minimum in forum cases. Some types of forums require more than reasonableness, but none allow less. Cf. Pittsburgh League of Young Voters Educ. Fund v. Port Auth. of Allegheny County, 653 F.3d 290, 296 (3d Cir. 2011) (“Pittsburgh”) (noting that we “need not tackle the forum-selection question” when a law or regulation would be invalid in any type of forum).

B. Allocating the burden

The core question for us is whether the City’s ban on non-commercial content is reasonable. At the heart of this is the tension between its justifications on the one hand and the record that we have before us on the other. Typically, when the government exercises its police powers, the scrutiny we apply is rational-basis review. Under this standard, a “legislative choice is not subject to courtroom fact-finding and may be based on rational speculation unsupported by evidence or empirical data.” FCC v. Beach Commc’ns, Inc., 508 U.S. 307, 315, 113 S.Ct. 2096, 124 L.Ed.2d 211 (1993). One of the hallmarks of rational-basis review is that the challenger, not the government, bears the burden of establishing the unconstitutionality of a law or regulation. See id. at 314-15, 113 S.Ct. 2096 (“On rational-basis review, [a statute] comes to us bearing a strong presumption of validity, and those attacking the rationality of [a] legislative classification have the burden to negat[e] every conceivable basis which might support it.”) (internal citation and quotation marks omitted).
Though the City does not invoke rational-basis review by name, these are the standards it uses to support its reasonableness arguments. This no doubt has some surface appeal, as “reasonable” and “rational” are frequently used as synonyms. But rational-basis review is not just the sum total of the various dictionary definitions of the word “rational.” Rather, it is a legal test that over time has developed certain characteristics — for instance, an al *443 location of the burden to the challenger and a strong presumption of validity. These requirements were developed to serve the circumstances in which courts apply rational-basis review — run-of-the-mill exercises of police powers. See Romer v. Evans, 517 U.S. 620, 631, 116 S.Ct. 1620, 134 L.Ed.2d 855 (1996) (“[I]f a law neither burdens a fundamental right nor targets a suspect class, we will uphold [a] legislative classification so long as it bears a rational relation to some legitimate end.”).
By contrast, when a law or regulation burdens a fundamental right such as the First Amendment, rational basis yields to more exacting review. Indeed, it has been the Supreme Court’s “consistent position that democracy stands on a stronger footing when courts protect First Amendment interests against legislative intrusion, rather than deferring to merely rational legislative judgments in this area.” Metromedia, Inc. v. City of San Diego, 453 U.S. 490, 519, 101 S.Ct. 2882, 69 L.Ed.2d 800 (1981) (plurality opinion). Thus, unlike with rational-basis review, when “the Government restricts speech, [it] bears the burden of proving the constitutionality of its actions.” United States v. Playboy Entertainment Group, Inc., 529 U.S. 803, 816, 120 S.Ct. 1878, 146 L.Ed.2d 865 (2000). This is so because the “presumption of validity that traditionally attends [the exercise of police powers] carries little, if any, weight where the ... regulation trenches on rights of expression protected under the First Amendment.” Schad v. Borough of Mount Ephraim, 452 U.S. 61, 77, 101 S.Ct. 2176, 68 L.Ed.2d 671 (1981) (Blackmun, J., concurring).
Neither the Supreme Court nor our Court has expressly decided the allocation of the burden to establish reasonableness in a limited public or nonpublic forum.[4] This is not surprising. Reasonableness is a relatively low bar, and in most instances the technical question of who bears the burden will not be consequential because the law or regulation would survive either way. But this is not a normal case, as the record here is strangely void of support for the City’s ban.
With the question now before us for the first time, we see no reason why the Playboy Entertainment Group rule would not apply. Even in limited public and nonpublic forums, First Amendment protections still exist. See, e.g., U.S. Postal Serv. v. Council of Greenburgh Civic Ass’ns, 453 U.S. 114, 131 n.7, 101 S.Ct. 2676, 69 L.Edüd 517 (1981) (“The First Amendment’s] ... ramifications are not confined to the public forum....”) (internal quotation marks omitted); Pittsburgh, 653 F.3d at 299 (assuming that the forum was nonpublic and striking down on First Amendment grounds the rejection of an advertisement). This is sufficient to shift the burden from the challenger to the City. It is true that the burden the City shoulders is “much more limited” than, for instance, strict (or even intermediate) scrutiny. ISKCON, 505 U.S. at 679, 112 S.Ct. 2701. But the burden, however limited, is still the City’s to meet.
This jibes with how some of our sister courts have defined reasonableness. See, e.g., Sammartano v. First Judicial Dist. Court, 303 F.3d 959, 966-67 (9th Cir. 2002) (“The ‘reasonableness’ requirement for restrictions on speech in a nonpublic forum requires more of a showing than does the traditional rational basis test; ie., it is not *444 the same as éstablishfing] that the regulation is rationally related to a legitimate governmental objective, as might be the case for the typical exercise of the government’s police power”) (internal quotation marks omitted) (alternation in original), abrogated on other grounds by Winter v. Natural Res. Def. Council, Inc., 555 U.S. 7, 129 S.Ct. 365, 172 L.Ed.2d 249 (2008); Multimedia Pub. Co. of S.C. v. Greenville-Spartanburg Airport Dist., 991 F.2d 154, 159 (4th Cir. 1993) (“[I]t isn’t enough simply to establish that the regulation is rationally related to a legitimate governmental objective, as might be the case for a typical exercise of the government’s police power, for this regulation affects protected First Amendment activity that is entitled to special solicitude even in this nonpublic forum.”) (internal citation omitted).

C. How to meet the burden

The next logical question is how the City can satisfy its burden to show that the ban on non-commercial content is reasonable. Our review of a trio of Supreme Court opinions, all written by Justice O’Connor, demonstrates that there are two ways it can do so: record evidence or commonsense inferences.
In the first case, Cornelius, which involved restrictions on participation in a charitable campaign in the federal workplace, the Court framed the reasonableness test for limited public and nonpublic forums as follows: “The reasonableness of the Government’s restriction of access ... must be assessed in the light of the purpose of the forum arid all the surrounding circumstances.” 473 U.S. at 809, 105 S.Ct. 3439. In applying this framework, the Court focused on the record evidence before it. See, e.g., id. at 808, 105 S.Ct. 3439 {“Based on the present record, we disagree and conclude that respondents may be excluded from the [forum].”) (emphasis added); id. at 811, 105 S.Ct. 3439 {“On this record, the Government’s posited justifications for denying respondents access to the [forum] appear to be reasonable in fight of the purpose of the [forum].”) (emphasis added).
The next case, United States v. Kokinda, 497 U.S. 720, 110 S.Ct. 3115, 111 L.Ed.2d 571 (1990), showed that not every conclusion needs to be backed up by evidence. Justice O’Connor, writing for a plurality, clarified that courts can use “common-sense” to “uphold a regulation under reasonableness review.” Id. at 734-35, 110 S.Ct. 3115 (plurality opinion) (internal quotation marks omitted). Kolcinda came about because the Postal Service, after years of trying to allow some types of solicitation of money on its property while precluding others, found that this approach was unworkable and that the better course was to prohibit all solicitation. The resulting regulation was supported by a thorough record, but for one point — the notion that solicitation is more disruptive than handing out literature — the plurality said that judges need look no further than logic and experience. Id.
The final piece of the puzzle is Justice O’Connor’s concurring opinion in ISKCON. There was a majority opinion written in that case by Chief Justice Rehnquist upholding a solicitation ban at three airports run by the Port Authority of New York and New Jersey. Meanwhile, a majority of the Court agreed that restrictions on distributing leaflets at those same airports were invalid, but the justices could not agree on a rationale. In these situations, “the holding of the Court may be viewed as that position taken by those Members who concurred in the judgment on the narrowest grounds.” City of Lakewood v. Plain Dealer Pub. Co., 486 U.S. 750, 764 n.9, 108 S.Ct. 2138, 100 L.Ed.2d 771 (1988) (internal quotation marks and alternation omitted). Justice O’Connor’s views on leafleting were the narrowest and *445 therefore speak for the Court. See, e.g., New England Reg’l Council of Carpenters v. Kinton, 284 F.3d 9, 20 n.5 (1st Cir. 2002) (“Because Justice O’Connor’s ISKCON concurrence constitutes the narrowest ground for the decision, it is the most authoritative pronouncement on the standards applicable to [leafleting] in a nonpublic forum.”); Hawkins v. City & County of Denver, 170 F.3d 1281, 1289 (10th Cir. 1999) (same).
The portion of her opinion dealing with leafleting makes clear that, whether the support comes from record evidence or common sense, courts must have some way of evaluating restrictions. The opinion contrasted the facts of that case, where there was no “record evidence to support [the leafleting] ban,” with those of Cornelius, where “the record amply supported]” the restriction on speech, and those of Kokin-da, where the solicitation ban was based on “the Postal Service’s 30-year history of regulation.” ISKCON, 505 U.S. at 691-92, 112 S.Ct. 2701 (O’Connor, J., concurring and concurring in judgment) (internal quotation marks omitted) (second alternation in original).
As Justice O’Connor explained, although the government does not need to prove that a particular use will actually disrupt the “intended function” of its property, id. at 691, 112 S.Ct. 2701 (quoting Perry, 460 U.S. at 52 n.12, 103 S.Ct. 948) (internal quotation marks omitted), “we have required some explanation as to why certain speech is inconsistent with the intended use of the forum,” id. at 691-92, 112 S.Ct. 2701. The opinion goes on to hold that the leafleting ban was unreasonable because “the Port Authority has provided no ... reason for prohibiting leafleting, and the record contains no information from which we can draw an inference that would support its ban.” Id. at 692, 112 S.Ct. 2701.
To synthesize, then, the City has a two-step burden that it can satisfy using record evidence or commonsense inferences. First, given that reasonableness “must be assessed in the light of the purpose of the forum and all the surrounding circumstances,” Cornelius, 473 U.S. at 809, 105 S.Ct. 3439, the evidence or commonsense inferences must allow us to grasp the purpose to which the City has devoted the forum. See also Greer v. Spock, 424 U.S. 828, 836, 96 S.Ct. 1211, 47 L.Ed.2d 505 (1976) (“The State, no less than a private owner of property, has power to preserve the property under its control for the use to which it is lawfully dedicated.”) (internal quotation marks omitted). And second, the evidence or commonsense inferences also must provide a way of tying the limitation on speech to the forum’s purpose. The City need not prove that the banned speech would cause harm if permitted, but per ISKCON it must provide a legitimate explanation for the restriction. In this context, we proceed to analyze the City’s ban on non-commercial content.

D. Applying the standards

The City has argued that its objectives for the advertising space are revenue. maximization and controversy avoidance and that the ban furthers them. Both justifications suffer from a lack of record evidence. And even with the benefit of commonsense inferences, neither passes muster.
As for revenue, Tyrrell testified that the City allows advertising in order to make money, and there is nothing to suggest otherwise. As such, the City has met the first part of its burden, which is to establish that revenue maximization is a purpose of the forum. But where things start to break down for the City is that there is no record evidence showing that the ban is reasonably connected to this goal. Although Tyrrell testified that advertisers “look at” the types of ads posted in the Airport to determine whether they would *446 want to advertise in proximity to those messages, he made clear that the ban was not intended to promote revenue and that in practice it arguably costs the City money.
Whereas the revenue justification runs into trouble at step two (showing a connection between the restriction and the purpose), the controversy avoidance rationale hits a snag even earlier in the analysis. In light of Tyrrell’s testimony, the only controversy the City could be trying to avoid is travelers’ exposure to non-commercial content they might find offensive. But no record evidence shows this is a purpose to which the City has devoted the Airport’s advertising space. The City had ample opportunities in Tyrrell’s deposition, as well as that of Mark Gale, the Airport’s CEO, to provide support for this purported purpose. And even after the depositions, the City could have come forward with affidavits. But the record we have lacks any evidence that directly supports its argument on appeal. This harms the City’s position because, although reasonableness review gives it the discretion to preserve a forum “for the use to which it is lawfully dedicated,” Greer, 424 U.S. at 836, 96 S.Ct. 1211 (internal quotation marks omitted), this presupposes that it actually has dedicated the property to that particular use, and we have no evidence that this occurred here.
The City’s failure to produce record evidence to clear step two on revenue maximization and step one on controversy avoidance could be excused if commonsense inferences supported its theory of the case. But they do not. In light of the testimony and the surrounding circumstances, an appeal to common sense cannot salvage the ban.
Given Tyrrell’s testimony that the ban is unrelated to revenue and arguably costs the City money, logic does not allow an inference that it is reasonably connected to revenue maximization. Indeed, what makes this case so unusual is that the record belies the inference the City wants us to draw. The City says we can ignore this and pretend Tyrrell’s deposition never occurred. This Alice-in-Wonderland argument misses the mark. The ability to use common sense is not a license to close our eyes and suspend disbelief. In other words, we cannot conclude that the ban serves a purpose that the City’s own representative has already disclaimed.
As for avoidance of controversy, inferences cannot help the City get past the first step of the inquiry — demonstrating that it has dedicated the advertising space to keeping travelers from seeing potentially offensive noncommercial content. We note at the outset-that, although-the City is permitted under the right circumstances to dedicate a limited public or nonpublic forum to controversy avoidance, this objective is nebulous and not susceptible to objective verification. As a result, Supreme Court guidance cautions against readily drawing inferences, in the absence of evidence, that controversy avoidance renders the ban constitutional. See, e.g., Cornelius, 473 U.S. at 812, 105 S.Ct. 3439 (“[T]he purported concern to avoid controversy excited by particular groups may conceal a bias against the viewpoint advanced by the excluded speakers.”); Metromedia, 453 U.S. at 510, 101 S.Ct. 2882 (plurality opinion) (noting that judgments that are “necessarily subjective, defying objective evaluation ... must be carefully scrutinized to determine if they are only a public rationalization of an impermissible purpose”). This is particularly apt here because the City has conceded that its justifications might be after-the-fact rationalizations. See Oral Arg. Tr. at 16-17.[5] Against this back *447 drop, the inference that the City wants us to draw is without support.
The only possible basis for an inference would be general testimony about the Airport. For instance, the City highlights Tyr-rell’s testimony that the Airport is a “very stressful” place, and hence there must be “a very concentrated and huge effort to keep everything positive, everything noncontroversial, and just create an environment that is soothing and pleasing.” This testimony does not relate specifically to the Airport’s advertising space, but rather speaks to that facility more broadly, of which the advertising space is but a small part. From this the City asks us to draw an inference that its asserted justification — preventing exposure to potentially offensive messages — is consistent with a purpose of the advertising space.
But if the City seeks to justify its regulation of the advertising space by reference to its goals for the entire Airport, then we should consider whether the atmosphere in the rest of the Airport supports such an inference. See, e.g., Cornelius, 473 U.S. at 801-02, 105 S.Ct. 3439 (looking to the “the special nature and function” of the broader property in which the forum is located). Elsewhere in the Airport, travelers have frequent exposure to televisions broadcasting shows and commercials containing a wide variety of non-commercial content. For instance, the NAACP submitted pictures of the Airport’s televisions that show content related to a gubernatorial election in Virginia, the war on drugs, the Confederate flag, and a piece of anti-discrimination legislation. And as they pass by newsstands, travelers can see magazines and newspapers displaying the very types of non-commercial information that the City seeks to exclude from its advertising space.
All of this indicates that there is little logic to the inference the City asks us to draw. Although we have no reason to doubt that the City does try to maintain a “soothing and pleasing” environment in the Airport, that broader effort apparently does not involve shielding travelers from noncommercial content on the ground that it might offend them. Instead, the Airport exposes them to an onslaught of noncommercial content outside of its advertising space without any suggestion that doing so is inconsistent with the environment it seeks to foster.
The City’s argument is essentially that common sense supports the inference that it would devote its advertising space to a purpose to which the rest of the Airport does not subscribe. Given that the advertising space is physically part of the Airport, this argument fails. As the D.C. Circuit has noted in a similar context:
Although we readily acknowledge the fact that the airports’ advertising facilities are physically distinct parts of the terminals ...[,] we note that these facilities are for the most part physically ‘separated’ from the terminals only by glass panels or translucent plexiglass whose sole purpose is to frame or project messages of outside organizations to the terminals’ ... users-Given this context, the display advertising areas at [the airports] cannot be wholly divorced — by structure, function, or fiat— *448 from the nature of the [locations] in which they [exist].
U.S. Sw. Africa/Namibia Trade & Cultural Council v. United States, 708 F.2d 760, 764-66 (D.C. Cir. 1983), abrogated on other grounds by ISKCON.
In sum, the City has not presented record evidence sufficient to demonstrate that its ban is reasonable. Nor does the record permit us to draw that inference using common sense. As a result, the ban violates the First Amendment.

E. The City’s counterargument

The City relies heavily on previous cases in which courts have examined commercial/non-commercial distinctions. This reliance is misplaced. Reasonableness is a case-specific inquiry, meaning that previous examples are of limited usefulness. And, under our facts, the City’s ban is unreasonable.
In distinguishing between commercial and noncommercial content, the City was by no means writing on a blank slate. In Lehman v. City of Shaker Heights, the Supreme Court upheld as reasonable such a distinction for advertisements on a city’s bus system. 418 U.S. 298, 304, 94 S.Ct. 2714, 41 L.Ed.2d 770 (1974) (plurality opinion) (“The city consciously has limited access to its transit system advertising space in order to minimize chances of abuse, the appearance of favoritism, and the risk of imposing upon a captive audience. These are reasonable legislative objectives advanced by the city in a proprietary capacity.”); id. (“Revenue earned from long-term commercial advertising could be [jeopardized] by a requirement that short-term candidacy or issue-oriented advertisements be displayed on car cards.”). However, Lehman does not help the City. As discussed, the NAACP asked Tyrrell about each of the factors from that case — minimizing abuse, avoiding favoritism, not imposing on a captive audience, and maximizing revenue — and he disclaimed all of them.[6]
The City also cites decisions of our sister courts labeling as reasonable distinctions on transit systems between commercial and non-commercial advertisements. See, e.g., Children of the Rosary v. City of Phoenix, 154 F.3d 972, 979 (9th Cir. 1998); Lebron v. Nat’l R.R. Passenger Corp. (Amtrak), 69 F.3d 650, 653 (2d Cir.), opinion amended on denial of reh’g, 89 F.3d 39 (2d Cir. 1995). Additionally, in Pittsburgh we struck down a commercial/noncommercial distinction as viewpoint discriminatory but noted that under the right circumstances such a provision might be constitutional. 653 F.3d at 299. However, none of this relieves us of our obligation to determine reasonableness on a case-by-case basis in light of the facts and circumstances of each particular forum. Cf. Air Line Pilots Ass’n, Int’l v. Dep’t of Aviation of City of Chicago, 45 F.3d 1144, 1159 (7th Cir. 1995) (“This [reasonableness] inquiry requires an examination of both the governmental interest and the particular forum’s nature and function. The fact that Lehman upheld a policy of excluding political advertisements in public buses hardly determines the reasonableness of such a restriction for all time. Instead, the reasonableness of [a restriction] must be *449 judged in light of the nature and purpose of the [forum].”) (internal citations omitted). For the reasons previously discussed, the City’s ban fails this test.
% % ijí ífc
No matter the type of forum, restrictions on speech on government property must be reasonable. The City’s ban on non-commercial ads at the Airport is unreasonable because it is not supported by the record or by commonsense inferences. The burden to establish reasonableness is a light one, but the City has failed to meet it here.[7] We need not determine whether the ban could survive on a different record; contrary to our dissenting colleague’s suggestion, see Dissent at 452 n.3, we take no position on this question. Our inquiry is limited to what is before us, and on that record the ban does not survive. As a result, we affirm the District Court’s grant of declaratory and injunctive' relief.[8]

. Because the exception allowing City-sponsored non-commercial content d'oes not bear on our analysis, we hereafter describe the policy as imposing a ban without reference to the exception.

. There has been some confusion about whether there are any practical differences between nonpublic and limited public forums. However, the Supreme Court recently "has used the term[s] ... interchangeably ...[,] thus suggesting that these categories of forums are the same.” Galena v. Leone, 638 F.3d 186, 197 n.8 (3d Cir. 2011).

. The Airport more broadly (as distinct from the advertising space) is also likely a limited public/nonpublic forum. Although airports are places where the public assembles, they are not traditional public forums. See Int’l Soc. for Krishna Consciousness, Inc. v. Lee, 505 U.S. 672, 680, 112 S.Ct. 2701, 120 L.Ed.2d 541 (1992) (“ISKCON”) ("[GJiven the lateness with which the modern air terminal has made its appearance, it hardly qualifies for the description of having immemorially [and] time out of mind been held in the public trust and used for purposes of expressive activity.”) (internal quotation marks omitted). And although it is conceivable that an airport could, under the right circumstances, become a designated public forum, the Supreme Court has said that this is unlikely. See id. at 682-83, 112 S.Ct. 2701 (concluding that the John F. Kennedy, La Guardia, and Newark airports in New York and New Jersey, which are "far from atypical,” are not designated public forums).

. We note that dicta from our Court goes in both directions. Compare United States v. Marcavage, 609 F.3d 264, 275 (3d Cir. 2010) (suggesting that the government bears the burden), with Gregoire v. Centennial Sch. Dist., 907 F.2d 1366, 1371 (3d Cir. 1990) (likening the review to a rational-basis test). Both statements were dicta because we ultimately determined that neither case involved a limited public or nonpublic forum.

. Q: But you’re telling us right now — the reasons for the written policies were enhanced
revenue and avoid[ance] [of] controversy. And
*447 those are good reasons, but you’ve got to supplement them by something, some support in the record.
A: No, you don’t, actually. That’s — that’s—
Q: You don't?
A: You don’t. That is the key. The [C]ity is— Q: You can make it up now?
A: Well, I — perhaps in the trial—
Q: Or when you write your brief.
A: Correct.
Q: Because no matter what you write you can make it up....
A: Well, I mean, this is not an unusual phe-nomenon_

. Lehman was a plurality opinion. Justice Douglas provided the fifth vote for the outcome in a concurring opinion that focused heavily on the issue of captive audiences. See id. at 308, 94 S.Ct. 2714 (Douglas, J., concurring in judgment) ("Since I do not believe that petitioner has any constitutional right to spread his message before this captive audience, I concur in the Court's judgment.”). The parties dispute the extent to which Lehman, in light of Justice Douglas’s opinion, should be limited to situations that present a captive audience. However, given that none of the interests served by the ban in Lehman are implicated in this case, we do not weigh in on this.

. Apart from reasonableness, a second requirement that exists no matter how we label the forum is viewpoint neutrality. Cornelius, 473 U.S. at 800, 105 S.Ct. 3439. Because unreasonableness is sufficient by itself to render the policy unconstitutional, we do not reach the viewpoint question. We note nonetheless that the issue may be a closer call than our dissenting colleague suggests. As discussed, the City has conceded that the policy might have been motivated by an animosity toward certain viewpoints. The dissent, relying on the "familiar principle of constitutional law that [we] will not strike down an otherwise constitutional statute on the basis of an alleged illicit legislative motive,” United States v. O’Brien, 391 U.S. 367, 383, 88 S.Ct. 1673, 20 L.Ed.2d 672 (1968), says that this does not matter. But in Cornelius the Court suggested that a restriction will be unconstitutional if it was "impermissibly motivated by a desire to suppress a particular point of view.” 473 U.S. at 812-13, 105 S.Ct. 3439. Indeed, Justice Stevens’s dissent clarified that "[e]veryone on the Court agrees that [a restriction] is prohibited by the First Amendment if it is motivated by a bias against the views of the excluded groups.” Id. at 833, 105 S.Ct. 3439 (Stevens, J., dissenting). Though some courts appear to say that motive is not enough and that there must be evidence that the restriction is being implemented in a discriminatory way, see Dissent at 456, we have never so held. As such, we note that this remains an open question in our Court.

. The District Court’s grant of relief also covered an unwritten policy under which the City rejected advertisements that did not “support the mission” of the Airport. NAACP, 2014 WL 7272410, at *3. In the District Court, the City denied that the unwritten policy existed. However, it has said on appeal that it does not seek reversal of the Court’s ruling on the unwritten policy if we affirm with respect to the written policy. See Appellant’s Br. at 24. Because the City has waived any challenge to the unwritten policy as distinct from the written one, we affirm the Court’s entry of judgment in its entirety without separately considering the unwritten policy.