**PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 23-2419
_____

NEW JERSEY STAFFING ALLIANCE;
AMERICAN STAFFING ASSOCIATION;
NEW JERSEY BUSINESS & INDUSTRY ASSOCIATION,
Appellants

v.

CARI FAIS, Acting Director of the New Jersey Division
of Consumer Affairs in the Department of Law and
Public Safety; STATE OF NEW JERSEY;
ROBERT ASARO-ANGELO, Commissioner of Labor and
Workforce Development; NEW JERSEY DIVISION OF
CONSUMER AFFAIRS IN THE DEPARTMENT OF LAW
AND PUBLIC SAFETY; NEW JERSEY DEPARTMENT
OF LABOR AND WORKFORCE DEVELOPMENT

_____

On Appeal from the United States District Court
for the District of New Jersey
(D.C. No. 1-23-cv-02494)
District Judge: Honorable Christine P. O'Hearn
_____

Argued on June 4, 2024

Before: HARDIMAN, PORTER, and AMBRO, *Circuit Judges*.

(Filed:   July 24, 2024)


Steven B. Harz
David L. Menzel
Rubin M. Sinins [Argued]
Javerbaum Wurgaft Hicks Kahn Wikstrom & Sinins
505 Morris Avenue
Suite 200
Springfield, NJ 07081
        *Counsel for Appellants*


Matthew J. Platkin
Jeremy M. Feigenbaum
Angela Cai
Mayur Saxena
Nathaniel I. Levy [Argued]
Jessica L. Palmer
Eve Weissman
Marc D. Peralta
Ashleigh B. Shelton
Lauren E. Van Driesen
Office of the New Jersey Attorney General
Richard J. Hughes Justice Complex
25 Market Street, P.O. Box 080
Trenton, NJ 08625
        *Counsel for Appellees*

_____

OPINION OF THE COURT
_____


HARDIMAN, *Circuit Judge*.

This interlocutory appeal was filed by the New Jersey Staffing Alliance, the American Staffing Association, and the New Jersey Business and Industry Association (collectively, the Staffing Associations or Associations). In the District Court, the Staffing Associations sought to enjoin a New Jersey law passed to provide certain temporary workers with labor protections. The District Court denied the injunction and the Staffing Associations appealed. We will affirm.

I

In 2023, New Jersey passed the Temporary Workers' Bill of Rights (the Act). N.J. Stat. Ann. § 34:8D-1 *et seq*. As its name suggests, the point of the Act is to protect temporary workers. To do so, the Act mandates recordkeeping and disclosure requirements and state certification procedures. *See id.* Some provisions also impose joint and several liability on clients who hire the staffing firms that provide them with temporary workers. *See, e.g.*, *id.* § 34:8D-7(d).

Section 7(b) of the Act creates new wage rules for temporary workers. It obliges staffing firms to pay temporary workers at least "the average rate of pay and average cost of benefits, or the cash equivalent thereof, of employees of the third party client performing the same or substantially similar work on jobs the performance of which requires equal skill,

effort, and responsibility, and which are performed under similar working conditions." *Id.* § 34:8D-7(b). Simply stated: staffing firms must peg their wages to the average wage of a permanent employee performing similar work at the client company. To comply with this provision, New Jersey staffing firms must obtain their customers' pay and benefits data.

The Staffing Associations sued New Jersey and various state agencies, alleging that the Act violates the dormant Commerce Clause. *N.J. Staffing All. v. Fais*, 2023 WL 4760464, at *4 (D.N.J. July 26, 2023). They alleged that the increased labor costs and the need for customers to disclose wage and benefits data will make New Jersey staffing firms less competitive. They also claimed that the wage provision in Section 7(b) is an impermissible price-setting measure that, in practice, disadvantages out-of-state customers. The Staffing Associations further alleged that Section 7(b) is void for vagueness because it does not define "benefits" or "same or substantially similar work." Finally, they claimed the Act is an unreasonable exercise of state police power.

The Staffing Associations argued that the economic burdens imposed by the Act threaten their members' existence. The District Court agreed that the businesses would be irreparably harmed by the Act, but it denied the preliminary injunction motion after concluding that the Staffing Associations were unlikely to succeed on the merits of their arguments.

The Associations were not likely to succeed, the District Court reasoned, because "[t]here is simply nothing discriminatory about the Act" and because "every burden imposed upon out-of-state businesses is likewise imposed on New Jersey businesses." *N.J. Staffing All.*, 2023 WL 4760464,

at *10. The Court explained that, "[i]n fact, out-of-state staffing agencies are in some sense *advantaged* over New Jersey businesses" because out-of-state staffing firms can hire labor at a lower cost for out-of-state customers. *Id.*

The District Court also found no likelihood of success on the void for vagueness claim. It reasoned that the Staffing Associations' nuanced argument on the meaning of Section 7(b) was a "tacit[] admi[ssion] that they know *exactly* the sort of relevant factors that ought to be considered" in interpreting the Act's requirements, even if "Section 7 does not tell [the Associations] explicitly which factors are most important or how they should be weighed." *Id.* at *12 (citation omitted). The District Court also noted that the New Jersey Department of Labor had issued proposed regulations for the Act to clarify Section 7(b), but concluded that Section 7(b) "would not be unconstitutionally vague on its face" even without the proposed regulations. *Id.* at *13 & n.16.

Finally, the District Court found the Staffing Associations were unlikely to succeed on their claim that the Act is an unreasonable exercise of state police power. Applying rational basis review, the Court concluded that the Act was a permissible exercise of New Jersey's police power because it furthers New Jersey's legitimate state interest in protecting temporary workers. This timely appeal followed.

II[1]

A preliminary injunction will issue only if a party shows a likelihood of success on the merits. *Ferring Pharms., Inc. v.*

---

[1] The District Court had jurisdiction under 28 U.S.C. § 1331, and we have jurisdiction under 28 U.S.C. § 1292(a)(1). We

*Watson Pharms., Inc.*, 765 F.3d 205, 210 (3d Cir. 2014). We agree with the District Court that the Staffing Associations failed to show they were likely to succeed on any of their three claims.

A

In *National Pork Producers Council v. Ross*, 598 U.S. 356 (2023), published less than one week after the Associations filed their initial complaint, the Supreme Court synthesized decades of dormant Commerce Clause jurisprudence into a few key principles. Chief among them is that economic "antidiscrimination . . . lies at the very core of [the Court's] dormant Commerce Clause jurisprudence." *Id.* at 369 (cleaned up). Although several prior dormant Commerce Clause opinions focused on the extraterritorial *effect* of challenged laws, the Court explained that those cases were still animated by the antidiscrimination principle. *Id.* at 371. After all, "a law's practical effects may also disclose the presence of a discriminatory purpose." *Id.* at 377.[2] Accordingly, as both the

review the District Court's factual findings for clear error, its legal conclusions de novo, and its order denying the preliminary injunction for abuse of discretion. *See Pyrotechnics Mgmt., Inc. v. XFX Pyrotechnics LLC*, 38 F.4th 331, 335 (3d Cir. 2022).

[2] The Court framed this principle as a central tenet of *Pike v. Bruce Church, Inc.*, 397 U.S. 137, 142 (1970). The Justices splintered on how broadly to read *Pike*, but we need not consider those disagreements because the Staffing Associations do not rely on *Pike*'s "practical effects" test for discrimination. Rather, they cite *Pike* to advocate for the very "extraterritoriality doctrine" that *National Pork Producers*

6

plurality opinion and the principal dissent concluded, the dormant Commerce Clause does not create a per se rule against state laws with extraterritorial effect. *See id.* at 373–74 (plurality opinion). *See also id.* at 394 (Roberts, C.J., concurring in part and dissenting in part). Rather, it "prohibits the enforcement of state laws driven by . . . economic protectionism—that is, regulatory measures designed to benefit in-state economic interests by burdening out-of-state competitors." *Id.* at 369 (cleaned up).

To illustrate how "protectionism [takes] center stage," *National Pork Producers* discussed three cases in which States implemented price-control laws that "operated like a tariff or customs duty." *Id.* at 372 (cleaned up) (discussing *Baldwin v. G. A. F. Seelig, Inc.*, 294 U.S. 511 (1935), *Brown-Forman Distillers Corp. v. N.Y. State Liquor Auth.*, 476 U.S. 573 (1986), and *Healy v. Beer Inst.*, 491 U.S. 324 (1989)). In *Baldwin*, the earliest of these cases, New York laws "barred out-of-state dairy farmers from selling their milk in the State 'unless the price paid to' them matched the minimum price New York law guaranteed in-state producers." *Nat'l Pork Producers*, 598 U.S. at 371–72 (quoting *Baldwin*, 294 U.S. at 519). The Court held that this discriminatory scheme violated the dormant Commerce Clause because it "deliberately robbed out-of-state dairy farmers" of the ability to leverage any competitive advantages over New York milk sellers stemming from "lower cost structures [or] more productive farming practices." *Id.* at 372.

In the two subsequent cases, the laws linked "the price of . . . in-state products to out-of-state prices" through price affirmations. *Id.* at 374 (quoting *Pharm. Rsch. & Mfrs. of Am.*

---

rejected. *See* Staffing Associations Br. 15, 20.

7

*v. Walsh*, 538 U.S. 644, 669 (2003)). "In *Brown-Forman*, New York required liquor distillers to affirm (on a monthly basis) that their in-state prices were no higher than their out-of-state prices," *id.* at 372 (citing *Brown-Forman*, 476 U.S. at 576), while in *Healy* "a Connecticut law required out-of-state beer merchants to affirm that their in-state prices were no higher than those they charged in neighboring States," *id.* (citing *Healy*, 491 U.S. at 328–30). The Supreme Court reasoned that these laws violated the dormant Commerce Clause because the States were trying to "hoard commerce for the benefit of in-state merchants and discourage consumers from crossing state lines to make their purchases from nearby out-of-state vendors." *Id.* at 372–73 (cleaned up).

In this appeal, the Staffing Associations do not claim the New Jersey legislature designed the Act to purposefully discriminate against out-of-state businesses. Instead, they liken the Act to the price-setting measures in *Baldwin*, *Brown-Forman*, and *Healy* and argue it is a "minimum pricing" measure that operates like "a tariff on the labor sent out-of-state." Staffing Associations Br. 19. We are unpersuaded.

We disagree with the Associations because the Act bears little resemblance to the laws at issue in *Baldwin*, *Brown-Forman*, and *Healy*. In those cases, the laws preferred in-state merchants by imposing price restrictions that applied only to out-of-state merchants. In contrast, the Act neither selectively imposes economic burdens on out-of-state staffing firms nor gives in-state firms an economic advantage. Rather, the Act imposes uniform wage restrictions on *all* firms doing business in New Jersey. And while the wage provision indirectly affects prices, it does not prevent out-of-state firms from "charg[ing] lower prices" than their New Jersey counterparts "thanks to

8

whatever . . . competitive advantage they might have." *Nat'l Pork Producers*, 598 U.S. at 372 (cleaned up).

Nor does the Act impose a tariff when New Jersey staffing firms send labor out of the State. Labor costs will vary depending on the average wage that each individual customer—regardless of location—pays its permanent employees for similar work. *See* N.J. Stat. Ann. § 34:8D-7(b). So if the average wage of a Pennsylvania client is lower than the average wage of a New Jersey client, staffing firms may reduce their prices accordingly.

The dormant Commerce Clause also precludes "attempts to give local *consumers* an advantage over consumers in other States." *Brown-Forman*, 476 U.S. at 580 (emphasis added) (citation omitted). Consistent with that principle, the Staffing Associations argue that the "Act disadvantages out-of-state [customers seeking to hire staffing firms] by limiting their ability to negotiate the best pricing between [staffing firms] in" New Jersey as compared to their home States. Staffing Associations Br. 19. We disagree. Out-of-state customers seeking labor will not inevitably pay more for labor than in-state customers because of the Act, and both are subject to the same wage-driven limits on the prices that New Jersey staffing firms will offer them.

Indeed, the Act imposes a *less* onerous burden on out-of-state customers because they can simply hire out-of-state staffing firms that are not subject to the Act. In contrast, New Jersey customers cannot avoid the Act by utilizing out-of-state firms because the Act applies to any staffing firm that does business in New Jersey. *See* N.J. Stat. Ann. § 34:8D-1. Thus, unlike the laws in the price-setting cases, the Act does not economically favor in-state firms or customers over their out-

9

of-state counterparts. *See Nat'l Pork Producers*, 598 U.S. at 374 (cleaned up).

Finally, the Staffing Associations emphasize the extraterritorial effects of the Act, explaining that out-of-state customers will be subject to the Act when hiring New Jersey firms because the Act imposes joint and several liability. But again, the dormant Commerce Clause does not prohibit laws solely because they have extraterritorial reach absent protectionist intent or effect. *See id.* at 373 (plurality). *See also id.* at 394 (Roberts, C.J., concurring in part and dissenting in part). And the Associations do not explain how uniformly applying joint and several liability to all customers, regardless of location, is "designed to benefit in-state economic interests by burdening out-of-state competitors." *Id.* at 369 (cleaned up).

In sum, the Act applies equally to in-state and out-of-state staffing firms and customers. New Jersey has passed the Act to protect temporary workers. In doing so, the State is, according to the District Court, irreparably harming the Staffing Associations and their members. But whatever the policy ramifications of the State's decision, nothing in the Act discriminates against out-of-state firms or consumers. The legislative winners here are New Jersey's temporary workers, and the losers are New Jersey staffing firms.[3] So the District

---

[3] We are not swayed by the Associations' assertion that the Act creates a risk of price gridlock. *See* Reply Br. 4–5 (quoting *Healy*, 491 U.S. at 339–40). They hypothesize that Pennsylvania could retaliate by mandating that its workers "be paid *more than* . . . New Jersey temporary workers." Staffing Associations Br. 15. But the question under the dormant Commerce Clause is whether New Jersey's law "benefit[s] in-state economic interests by burdening out-of-state

Court did not err by finding the Associations are unlikely to succeed on their dormant Commerce Clause claim.

B

The Staffing Associations next claim that Section 7(b) is void for vagueness because it does not define "benefits" or "same or substantially similar work." We are unpersuaded.

"[C]ivil statutes that regulate economic activities" must give businesses "fair notice" of the law's requirements. *Fed. Trade Comm'n v. Wyndham Worldwide Corp.*, 799 F.3d 236, 250 (3d Cir. 2015). Businesses, after all, "face economic demands to plan behavior carefully, [and] can be expected to consult relevant legislation in advance of action" to ensure regulatory compliance. *Vill. of Hoffman Ests. v. Flipside, Hoffman Ests., Inc.*, 455 U.S. 489, 498 (1982). The presence of "some ambiguities" does not prevent enforcement of an economic regulation; rather, it is void for vagueness only if it is "so vague as to be no rule or standard at all." *CMR D.N. Corp. v. City of Philadelphia*, 703 F.3d 612, 631–32 (3d Cir. 2013) (cleaned up).

Section 7(b) mandates equal pay between temporary workers and permanent employees who perform the "same or

---

competitors," *Nat'l Pork Producers*, 598 U.S. at 369 (cleaned up)—not how other States may respond to the law. And while the Supreme Court did discuss the risk of price gridlock in *Healy*, it did so only *after* concluding that the challenged law violated the dormant Commerce Clause. *See Healy*, 491 U.S. at 339–40. Because the law was protectionist, the Court reasoned that price gridlock could follow if multiple states "enacted . . . essentially identical" laws. *Id.* at 339.

substantially similar work on jobs the performance of which requires equal skill, effort, and responsibility, and which are performed under similar working conditions." N.J. Stat. Ann. § 34:8D-7(b). The language of the Act resembles that of the federal Equal Pay Act, which prohibits sex-based pay discrimination against employees performing "equal work on jobs the performance of which requires equal skill, effort, and responsibility, and which are performed under similar working conditions." 29 U.S.C. § 206(d)(1). In drafting the Equal Pay Act, Congress was concerned that "equal work" by itself was vague, so "the concepts of 'skill,' 'effort,' 'responsibility,' and 'working conditions'" were added to define the phrase. *See Corning Glass Works v. Brennan*, 417 U.S. 188, 199–200, 01 (1974). So too here, the Act defines "substantially similar work" by listing the same considerations. Though this definition contains "some ambiguities," it is not "so vague as to be no rule or standard at all." *CMR D.N. Corp.*, 703 F.3d at 631–32 (cleaned up). In other words, though reasonable minds may differ as to what constitutes "equal skill, effort, and responsibility" or "similar working conditions," these criteria provide sufficient guideposts for us to conclude that the Staffing Associations have fair notice of the Act's requirements.

The word "benefits" in Section 7(b) is not impermissibly vague either. While the Act does not provide a comprehensive list of "benefits," we conclude that "business people of ordinary intelligence in the [Staffing Associations'] position . . . would be able to know what" the word means "as a matter of ordinary commercial knowledge." *McGowan v. Maryland*, 366 U.S. 420, 428 (1961). The Associations demonstrated as much in their brief on appeal: they showed a general understanding of what "benefits" encompasses when

raising specific workability concerns on issues like 401(k) waiting periods and employees who decline employer-sponsored healthcare.

Finally, we agree with the District Court that "Plaintiffs, their members, and their members' third-party partners have been abiding by . . . [both federal and state] laws [using similar language] for decades. In short, although the application to temporary workers is novel, they know how to do this." *N.J. Staffing All.*, 2023 WL 4760464, at \*12; *see, e.g.*, N.J. Stat. Ann. § 10:5-12 (establishing safeguards for employees belonging to a protected class and using language nearly identical to the Act: "substantially similar work, when viewed as a composite of skill, effort and responsibility"); 29 U.S.C. § 206(d)(1) (prohibiting sex-based pay discrimination against employees performing "equal work on jobs the performance of which requires equal skill, effort, and responsibility, and which are performed under similar working conditions"); N.J. Stat. Ann. § 10:5-12(t) (prohibiting companies from paying employees in a protected class "at a rate of compensation, *including benefits*, which is less than the rate paid" to employees who are not in a protected class) (emphasis added). Indeed, by identifying the relevant considerations when applying Section 7(b) and contesting the precise parameters of its terminology, the Associations have inadvertently demonstrated that the Act is not "so vague as to be no rule or standard at all." *CMR D.N. Corp.*, 703 F.3d at 632 (cleaned up).

C

Finally, we turn to the Staffing Associations' police power challenge. State police power "extends beyond health, morals and safety, and comprehends the duty, within

13

constitutional limitations, to protect the well-being . . . of a community." *Kovacs v. Cooper*, 336 U.S. 77, 83 (1949). We apply rational basis review to a State's exercise of its police power. *See Nat'l Ass'n for Advancement of Colored People v. City of Philadelphia*, 834 F.3d 435, 442 (3d Cir. 2016).

The Associations concede that New Jersey has a legitimate interest in protecting temporary workers but argue the State's method of doing so is "[u]nreasonable."[4] Staffing Associations Br. 33. The Act seeks to "further protect the labor and employment rights of these workers," N.J. Stat. Ann. § 34:8D-1(d), by mandating increased disclosures on wages, *id.* § 34:8D-6, more transparency on working conditions, *id.* § 34:8D-3, prohibitions on employer fees for work-related transportation, *id.* § 34:8D-5, and wage equality between temporary workers and permanent employees, *id.* § 34:8D-7(b). The provisions just reviewed are rationally related to the State's interest in protecting temporary workers. So the District Court did not err in finding the Associations failed to show a likelihood of success on the merits of their police power challenge.

III

We agree with the District Court that the Staffing Associations are unlikely to succeed on the merits of any of

---

[4] The Associations also contend the Act "in effect makes temporary workers a suspect classification." Staffing Associations Br. 35–36. But even if it does, legislation "will be sustained if the classification drawn by the statute is rationally related to a legitimate state interest." *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 440 (1985) (citations omitted).

14

their challenges to the Act. So the request for an injunction was properly denied. We will affirm.