PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 18-2380
_____

SILVIE POMICTER;
LAST CHANCE FOR ANIMALS

v.

LUZERNE COUNTY CONVENTION CENTER
AUTHORITY; SMG,
                              Appellants
_____

On Appeal from the United States District Court
for the Middle District of Pennsylvania
(D.C. Civil Action No. 3-16-cv-00632)
District Judge: Honorable Robert D. Mariani
_____

Argued: April 16, 2019

Before:  AMBRO, GREENAWAY, JR., and SCIRICA,
*Circuit Judges*.

(Filed: September 23, 2019)

Donald H. Brobst
Thomas J. Campenni [ARGUED]
Robert L. Gawlas
Rosenn Jenkins & Greenwald
15 South Franklin Street
Wilkes-Barre, PA 18711
    *Counsel for Appellants*


Alexander Bilus [ARGUED]
Amy S. Kline
Meghan J. Talbot
Saul Ewing Arnstein & Lehr
1500 Market Street
Centre Square East, 38th Floor
Philadelphia, PA 19102

Mary Catherine Roper
American Civil Liberties Union of Philadelphia
P.O. Box 60173
Philadelphia, PA 19106

Vic Walczak
American Civil Liberties Union of Philadelphia
247 Fort Pitt Boulevard
Pittsburgh, PA 15222
    *Counsel for Appellees*


————————————

OPINION OF THE COURT
————————————

**SCIRICA**, *Circuit Judge*.

This appeal involves government restrictions on speech at a publicly owned arena in Wilkes-Barre, Pennsylvania. The primary issue we must resolve is whether the government's policy sequestering all protest activity to enclosures by each entrance of the Mohegan Sun Arena is facially unconstitutional under the First Amendment. In a public forum—a government space dedicated to the free exchange of ideas—the governing authority may not confine speech in this way without showing its restrictions are narrowly tailored to serve a significant interest. But the animal rights activists challenging the policy have conceded that the Arena's concourse is a nonpublic forum, a space which the government may reasonably reserve for its intended purpose. As the concourse's function is to facilitate movement of pedestrians into and out of the Arena, we cannot find unreasonable a policy sensibly designed to minimize interference with that flow. Accordingly, we will reverse the District Court's order because the policy is constitutional. But because the government has not met its burden to show the other two policies at issue—bans on profanity and voice amplification—are reasonable, we will affirm the court's injunction of those policies.

## I.

### A.

Defendant Luzerne County Convention Center Authority owns the Mohegan Sun Arena, a large event space in Wilkes-Barre, Pennsylvania. The Arena—which holds up to

10,000 people—hosts athletic and other commercial entertainment events, including national touring acts like the circus, concerts, Disney on Ice, and World Wrestling Entertainment. Though the Arena is publicly owned, it operates as a business that must earn enough to pay its expenses. The Authority contracts with Defendant SMG to manage the Arena's day-to-day operations.

The Arena building is set back from the public road and surrounded by several large parking lots. Patrons attending events at the Arena drive from the public road onto an access road, park in one of the lots, and then walk to the Arena's entrances. This is the only way to access the Arena, as it is separated from the public road by a grass median and fence. A large concrete concourse connects the parking lots to the Arena. The concourse houses two entrances for the Arena's patrons, termed the "East Gate" and "West Gate," and includes a pathway between the two gates.[1] The concourse is generally open to the public but primarily used by patrons attending Arena events.

Under the Arena's protest policy, "[a]ll persons are welcome to express their views" at the Arena. App. 400. The Arena's policy imposes several limits on protest activity, three of which are at issue here. First, protesters must stand within "designated area[s]" on the concourse and "[h]andouts can only be distributed from within" those areas (the "location condition"). *Id.* The designated areas are two "rectangular

---

[1]     The part of the concourse in front of the East Gate measures 18,746 square feet, the area in front of the West Gate measures 10,560 square feet, and the sidewalk connecting the two is 321 feet long and 30 feet wide.

enclosure[s] constructed from bike racks" that are 500 to 700 square feet and set up on the concourse next to the East and West Gates. *Pomicter v. Luzerne Cty. Convention Ctr. Auth.*, 322 F. Supp. 3d 558, 565 (M.D. Pa. 2018) (hereinafter *Pomicter II*). Second, the policy bans protesters from using profanity and "promotional verbiage suggesting vulgarity or profanity" (the "profanity ban"). App. 400. Finally, the protest policy prohibits any artificial voice amplification (the "amplification ban"). *Id.*

**B.**

In 2016, Silvie Pomicter and Last Chance for Animals (LCA) sued the Authority and SMG, contending the Arena's protest policy infringes their free speech rights. In a facial challenge, they allege the policy violates the First Amendment of the United States Constitution and Article I of the Pennsylvania Constitution.[2] Pomicter—who, along with LCA,

---

[2] Plaintiffs bring their federal constitutional claims pursuant to 42 U.S.C. § 1983, which "provides a remedy for deprivations of rights secured by the Constitution and laws of the United States when the deprivation takes place under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory." *Pomicter v. Luzerne Cty. Convention Ctr. Auth.*, No. 16-632, 2016 WL 1706165, at *4 (M.D. Pa. Apr. 27, 2016) (hereinafter *Pomicter I)* (quoting *Lugar v. Edmondson Oil Co.*, 457 U.S. 922, 924 (1982)). In ruling on Plaintiffs' motion for a preliminary injunction, the trial court found that the Authority was "a public governmental entity acting under color of state law" and that SMG, though nominally a private entity, was a "'willful participant in joint activity' with the Authority and thus qualifie[d] as a state

5

opposes the use of animals by circuses—had protested at past circus performances at the Arena, and she alleged her confinement to the enclosures limited her ability to communicate with patrons. Plaintiffs sought declaratory and injunctive relief prohibiting Defendants from enforcing the location condition, the profanity ban, and the amplification ban.

Immediately after filing their complaint, Plaintiffs moved for a preliminary injunction challenging the location condition only. They planned to protest at upcoming circus performances at the Arena and sought to protest and distribute leaflets outside the designated areas. After holding an evidentiary hearing, the District Court granted Plaintiffs' motion in part, finding the location condition "unreasonable 'in light of the characteristic nature and function' of the Arena." *Pomicter I*, 2016 WL 1706165, at *5 (quoting *United States v. Kokinda*, 497 U.S. 720, 732 (1990)). It crafted a less restrictive policy in its injunction. The injunction allowed up to twenty protesters to distribute literature and talk to patrons within a circumscribed section of the concourse,[3] but protesters could not approach anyone in line or otherwise "block the ingress or egress of patrons." App. 107.

_____

actor." *Id.* (quoting *Lugar*, 457 U.S. at 941). Defendants do not challenge these correct gateway determinations on appeal.

[3] The Court noted the concourse comprises two distinct sections. The "entry bridge"—the 37 feet surrounding each entrance gate—is a light concrete, and the 60 feet between the entry bridge and the parking lot is a darker shade. *Pomicter I*, 2016 WL 1706165, at *2. The injunction did not permit protesting in the entry bridge or the first six feet of the dark concrete from the parking lots.

6

Plaintiffs protested under the terms of the preliminary injunction at circus performances at the Arena in 2016 and in 2017. The Court later held a bench trial. Pomicter testified that, during the circus protest in 2016, twelve protesters left the designated areas to protest on the concourse. They were able to distribute far more literature than the protesters in the designated areas, who attracted little attention from patrons. Plaintiffs also introduced videos of the protest, which showed mainly nonconfrontational interactions between patrons and protesters, with no abnormal congestion created on the concourse.[4]

While Plaintiffs focused on the circus protests under the terms of the injunction, Defendants emphasized that the policy was designed to deal with the range of potential groups that may protest at the Arena. Brian Sipe, the Arena's General Manager, testified that, while Plaintiffs were not unruly protesters, the Arena expected other groups may be less cooperative. Because the Arena may not be able to effectively manage protesters outside the designated areas, the location condition minimizes congestion and security risks, and allows law enforcement to more easily control crowds at the Arena.

The District Court ruled in favor of Plaintiffs and found all three restrictions violated the First Amendment.[5] As to the

---

[4]     The videos were only taken before Arena events as patrons were entering; there were no videos showing traffic flow as patrons exited the Arena.

[5]     In addition, because "[t]he corresponding Pennsylvania constitutional provision 'provides protection for freedom of expression that is broader than the federal constitutional

location condition and amplification ban, the Court discounted Defendants' proffered explanations for the policies, finding them speculative and unreasonable. *See Pomicter II*, 322 F. Supp. 3d at 571. As to the profanity ban, the Court held it "unreasonably singles out First Amendment activity by imposing" the ban "on protesters alone." *Id.* at 577. It entered judgment for Plaintiffs and enjoined Defendants from enforcing the three restrictions, though it noted more carefully crafted restrictions may be permissible.[6] Defendants now appeal.[7]

---

guarantee[,]'" the court held the restrictions were also "unreasonable under Pennsylvania law." *Pomicter II*, 322 F. Supp. 3d at 567 (quoting *Pap's A.M. v. City of Erie*, 812 A.2d 591, 605 (Pa. 2002)) (second alteration in original).

[6] Plaintiffs moved to amend the judgment because the Court's opinion and injunction did not specifically address whether protesters could carry signs outside the enclosures. The Court issued a supplemental opinion and order holding Defendants could not confine protesters with signs to the designated areas. According to the Court, "the reasoning of permitting leafletting activity applies with equal force to the act of carrying signs and picketing." *Pomicter v. Luzerne Cty. Convention Ctr. Auth.*, No. 16-632, 2018 WL 2325407, at *4 (M.D. Pa. May 22, 2018).

[7] The District Court had jurisdiction under 28 U.S.C. §§ 1331 and 1367. We have jurisdiction under 28 U.S.C. § 1291. On appeal from a bench trial, our Court "reviews a district court's findings of fact for clear error and its conclusions of law *de novo*." *VICI Racing, LLC v. T-Mobile USA, Inc.*, 763 F.3d 273, 282–83 (3d Cir. 2014). We review an order granting injunctive relief for abuse of discretion. *Alpha Painting &*

## II.

The First Amendment, applied to state and local governments through the Fourteenth Amendment, prohibits laws and regulations "abridging the freedom of speech." U.S. Const. amend. I. As noted, the Arena's protest policy confines all protest activity to the designated enclosures, in addition to banning profanity and artificial voice amplification. Our precedent is clear that these restrictions implicate protected speech. *See Brown v. City of Pittsburgh*, 586 F.3d 263, 269 (3d Cir. 2009) ("[L]eafletting, sign displays, and oral communication . . . are indisputably protected forms of expression.") (internal quotation marks omitted); *Startzell v. City of Philadelphia*, 533 F.3d 183, 199 n.10 (3d Cir. 2008) ("[A]mplified speech, such as through the use of bullhorns, is protected expression.").

Protected speech is not immune from regulation. *See Cornelius v. NAACP Legal Def. & Educ. Fund, Inc.*, 473 U.S. 788, 799 (1985) ("Even protected speech is not equally permissible in all places and at all times."). The forum in which the speech takes place governs what regulation is permissible, and, in a nonpublic forum like the concourse here, protected speech is subject to reasonable regulations.

## A.

In assessing the Authority's restriction on protected speech, we are guided by the forum analysis, which serves "as

*Constr. Co. v. Del. River Port Auth. of Pa. & N.J.*, 853 F.3d 671, 683 (3d Cir. 2017).

a means of determining when the Government's interest in limiting the use of its property to its intended purpose outweighs the interest of those wishing to use the property for other purposes." *Kokinda*, 497 U.S. at 726 (quoting *Cornelius*, 473 U.S. at 800). Under this framework, "the extent to which the Government can control access depends on the nature of the relevant forum." *Id.* (quoting *Cornelius*, 473 U.S. at 800). On one side of the spectrum is a public forum, property that "has been traditionally open to the public for expressive activity, such as public streets and parks." *Id.* In these spaces, "the rights of the state to limit expressive activity are sharply circumscribed." *United States v. Marcavage*, 609 F.3d 264, 279 (3d Cir. 2010) (quoting *Perry Educ. Ass'n v. Perry Local Educators' Ass'n*, 460 U.S. 37, 45 (1983)). Time, place, and manner restrictions must be content neutral and narrowly tailored, while content-based restrictions must meet the even higher bar of being the least restrictive means of achieving a compelling government interest. *Id.* In designated public forums—property "which the state has opened for use by the public as a place for expressive activity"—restrictions on speech are examined the same way. *Perry Educ. Ass'n*, 460 U.S. at 45.[8]

In nonpublic forums—government property that is not dedicated to First Amendment activity—the government has more "flexibility to craft rules limiting speech." *Minn. Voters*

---

[8] The Supreme Court has made clear that "[t]he government does not create a public forum by inaction or by permitting limited discourse, but only by intentionally opening a nontraditional forum for public discourse." *Cornelius*, 473 U.S. at 802 (citation omitted).

10

*All. v. Mansky*, 138 S. Ct. 1876, 1885 (2018). Although it "does not enjoy absolute freedom from First Amendment constraints," *Kokinda*, 497 U.S. at 725, "the government, 'no less than a private owner of property,' retains the 'power to preserve the property under its control for the use to which it is lawfully dedicated,'" *Minn. Voters All.*, 138 S. Ct. at 1885 (quoting *Adderley v. Florida*, 385 U.S. 39, 47 (1966)). This is because "[n]othing in the Constitution requires the Government freely to grant access to all who wish to exercise their right to free speech on every type of Government property without regard to the nature of the property or to the disruption that might be caused by the speaker's activities." *Id.* (quoting *Cornelius*, 473 U.S. at 799–800). Rather, the government may reserve a nonpublic forum "for its intended purposes, communicative or otherwise, as long as the regulation on speech is reasonable and not an effort to suppress expression merely because public officials oppose the speaker's view." *Id.* (quoting *Perry Educ. Ass'n*, 460 U.S. at 46). In a nonpublic forum, speech restrictions need only be reasonable, "a much more limited review" than applied in public forums. *Int'l Soc'y for Krishna Consciousness, Inc. v. Lee*, 505 U.S. 672, 679 (1992).

Here, the relevant forum, or the "specific public property that [Plaintiffs] seek[] to access," is the concourse outside the Arena. *NAACP v. City of Philadelphia*, 834 F.3d 435, 442 (3d Cir. 2016). Plaintiffs concede in this suit that the concourse is a nonpublic forum. "The question whether a particular [property] is a public or a nonpublic forum is highly fact-specific and no one factor is dispositive." *Marcavage*, 609 F.3d at 275. In the absence of evidence and argument to the contrary, we accept Plaintiffs' concession that the concourse is being used at present as a nonpublic forum. *Cf. United States*

11

*v. Bjerke*, 796 F.2d 643, 649 (3d Cir. 1986) (holding walkways "not dedicated to serve the traditional functions of streets or parks, but rather for the particular function of accommodating post office patrons on official business," were a nonpublic forum); *Int'l Soc'y for Krishna Consciousness, Inc. v. N.J. Sports & Exposition Auth.*, 691 F.2d 155, 161 (3d Cir. 1982) (reasoning that "commercial" nature of sports complex made it a nonpublic forum). We caution, however, that a public arena and its entranceway may not always be treated this way. If there was evidence showing, for example, that the concourse was "used for purposes of assembly, communicating thoughts between citizens, and discussing public questions," our analysis would be different. *Perry Educ. Ass'n*, 460 U.S. at 45 (quoting *Hague v. CIO*, 307 U.S. 496, 515 (1939)); *cf. Paulsen v. Cty. of Nassau*, 925 F.2d 65, 70 (2d Cir. 1991).[9]

As noted, speech restrictions in nonpublic forums must be reasonable in light of the purpose served by the forum and

---

[9] We also emphasize that Plaintiffs bring a facial challenge, where we must assess whether the policy is "unconstitutional in all of its applications." *Wash. State Grange v. Wash. State Republican Party*, 552 U.S. 442, 449 (2008). Plaintiffs' challenge here is limited to the Arena's use as a nonpublic forum. If the speech restrictions pass muster under the reasonableness analysis, they cannot be *facially* invalid. But that is not to say that the restrictions are constitutional in every application. Though Plaintiffs don't raise the point, the District Court noted that the Arena has hosted political events and rallies in the past. If an as-applied challenge were raised in this context, both our reasoning and conclusion could be different. But as noted, Plaintiffs conceded this is a nonpublic forum.

viewpoint neutral. There is no claim that the Arena's protest policy discriminates based on viewpoint or that it is enforced in a discriminatory way. Accordingly, we must examine whether the policy is "reasonable in light of the purpose served by the forum." *Cornelius*, 473 U.S. at 806 (citation omitted).

**B.**

Because of the importance of the interests protected by the First Amendment, the government bears the burden to show its speech restrictions are reasonable. *See NAACP*, 834 F.3d at 443. But unlike in public forums, the government's "burden to establish reasonableness" in nonpublic forums "is a light one." *Id.* at 449. Since the "flexibility" afforded to the government in these settings is justified by the government's ability to preserve property for its intended uses, *Minn. Voters All.*, 138 S. Ct. at 1885, the government must provide a legitimate explanation for the restriction in "light of the purpose of the forum and all the surrounding circumstances," *Cornelius*, 473 U.S. at 809. To be "legitimate," the government's explanation must be supported by either record evidence or "commonsense inferences" based on the record. *NAACP*, 834 F.3d at 445. Once this requirement is met, though, we give the government latitude to devise appropriate regulations. "Even if more narrowly tailored regulations could be promulgated," the government "is only required to adopt *reasonable* regulations, not 'the most reasonable or the only reasonable' regulation possible." *Kokinda*, 497 U.S. at 735–36 (quoting *Cornelius*, 473 U.S. at 808).

For instance, in a case similar to the one now before us, we reviewed a policy prohibiting solicitation and leafletting at the Meadowlands sports complex. *See N.J. Sports*, 691 F.2d at

13

161. We rejected a challenge by plaintiffs who sought simultaneously to solicit donations and distribute literature at the race track and arena.[10] Among other justifications for the policy, the government explained solicitation "would compete with the Authority for its patrons' money and disrupt the normal activities of the complex." *Id.* Having found that the Meadowlands was a commercial venture expected to generate revenue, we determined "it is not unreasonable for the Authority to prohibit outside groups from engaging in activities which are counterproductive to its objectives." *Id.* Although it was certainly possible to conceive of more limited or carefully tailored restrictions than an absolute ban on solicitation—such as restrictions prescribing the time or place when solicitation is permitted—we did not require the government to take such steps. Because the restriction was reasonably explained in light of the purpose of the forum, it was constitutional.

The flexibility of the reasonableness standard also empowers the government to act prophylactically. In *Perry Education Ass'n v. Perry Local Educators' Ass'n*, for instance, the Supreme Court considered a school district policy that allowed the bargaining representative teacher's union—but not its rival—access to an internal mail system. *See* 460 U.S. at 40. Stressing the flexibility afforded to the government when dealing with a nonpublic forum, the Court held the policy "may reasonably be considered a means of insuring labor-peace within the schools." *Id.* at 52. Even though there was "no

---

[10] Although the cases are similar, the result in *New Jersey Sports* does not dictate our outcome here. "Reasonableness is a case-specific inquiry, meaning that previous examples are of limited usefulness." *NAACP*, 834 F.3d at 448.

showing in the record of past disturbances" or "evidence that future disturbance would be likely," there is no "require[ment] that such proof be present to justify the denial of access to a non-public forum on grounds that the proposed use may disrupt the property's intended function." *Id.* at 52 n.12. As the Court has emphasized, "the Government need not wait until havoc is wreaked to restrict access to a nonpublic forum." *Cornelius*, 473 U.S. at 810.

"[A]lthough the government does not need to prove that a particular use will actually disrupt the 'intended function' of its property," in *NAACP* we reiterated that the record must contain enough "information from which we can draw an inference that would support" the speech restriction. 834 F.3d at 445 (quoting *Lee*, 505 U.S. at 691 (O'Connor, J., concurring)). There, we held the Philadelphia Airport's ban on noncommercial content in its advertising space was not reasonable because the city's explanations were belied by the record. The city first contended the policy was intended to promote revenue maximization. We concluded this was not a legitimate explanation because the record lacked any support to connect the ban to this goal; the city's representative testified the ban was *not* intended to promote revenue and instead cost the city money. *Id.* at 445–46. Commonsense inferences could not fill the gap, as we would not accept a justification disclaimed in the city's testimony. *Id.* at 446. The city next sought to justify the ban as a way to avoid controversy, pointing to testimony about efforts to make the Airport a pleasant place for travelers. *Id.* at 446–47. But that explanation was inconsistent with the record evidence relating to the overall nature of the forum, which showed an "onslaught of noncommercial content" throughout the Airport. *Id.* at 447. We refused to credit an "inference that [the Airport] would devote

15

its advertising space to a purpose to which the rest of the Airport does not subscribe." *Id.*

In sum, though the government faces a "relatively low bar" to show reasonableness in a nonpublic forum, its speech restrictions are still subject to limitation: it may not offer justifications unsupported by the record. *Id.* at 443. The record must allow us to "grasp the purpose" of the forum and, critically, understand how the speech activity at issue may disrupt that purpose. *Id.* at 445; *see also New England Reg'l Council of Carpenters v. Kinton*, 284 F.3d 9, 20 (1st Cir. 2002) (describing reasonableness review as a "fact-intensive" inquiry considering "the uses to which the forum typically is put," the "risks associated with the speech activity," and the "proffered rationale"); *Hawkins v. City & Cty. of Denver*, 170 F.3d 1281, 1290 (10th Cir. 1999) (same). If the restrictions are reasonably explained, accord with the evidence or commonsense, and are connected to the purpose of the forum, we are constrained to be lenient in our review.

## III.

In *NAACP*, we organized the reasonableness analysis into two steps, which will guide our analysis here. "First, given that reasonableness 'must be assessed in the light of the purpose of the forum and all the surrounding circumstances,'" we consider the purpose of the forum. *NAACP*, 834 F.3d at 445 (quoting *Cornelius*, 473 U.S. at 809). Second, we assess whether Defendants have provided a legitimate explanation related to the purpose of the forum and supported by "evidence or commonsense inferences" for the three restrictions at issue here. *Id.*

16

**A.**

We first consider the purpose of the forum. As noted, the relevant forum, or the specific space Plaintiffs seek to access, is the concourse outside the Arena. Record evidence or commonsense inferences must show "the purpose to which the [government] has devoted the forum." *Id.* Though we focus on the concourse, this "does not mean . . . that [we] will ignore the special nature and function" of the Arena—which, as we've described, is a large commercial event space—"in evaluating the limits that may be imposed" on protest activity on the concourse. *Cornelius*, 473 U.S. at 801–02; *see also NAACP*, 834 F.3d at 447.

Defendants contend, and the record confirms, that the concourse is dedicated to a single purpose: providing for the passage of patrons into and out of the Arena. Customers attending events at the Arena park in the parking lots and walk to the concourse, which provides a pathway for them to enter and exit through the Arena's two gates. Sipe testified that the concourse was constructed so that "patrons, after they're done parking their car, can enter into the facility." App. 281. He confirmed that "thousands of people enter[] and exit[] the building in a very short period of time" before and after events, and the concourse is the only way they may do so. App. 121. And because the concourse is next to the parking lot, it is important that the areas immediately abutting the lot remain clear to prevent "backing people up into the traffic area." App. 478.

**B.**

17

With the forum's purpose and circumstances in mind, the second step is to assess whether Defendants have "provide[d] a legitimate explanation for" each of the three challenged restrictions. *NAACP*, 834 F.3d at 445. As we have explained, record evidence or commonsense inferences "must provide a way of tying the limitation on speech to the forum's purpose." *Id.* Accordingly, we will examine the record evidence about the three restrictions and assess each restriction "in light of the characteristic nature and function" of the forum. *Kokinda*, 497 U.S. at 732 (quoting *Heffron v. Int'l Soc'y for Krishna Consciousness, Inc.*, 452 U.S. 640, 651 (1981)).

**1.**

We begin with the location condition, which requires protesters to stand within designated areas on the concourse next to the Arena's two entrance gates. According to Defendants, the primary purpose of that restriction is to maintain the orderly and safe movement of patrons into and out of the Arena. Sipe testified that allowing protesters to freely interact with patrons could impede traffic flow as patrons enter and exit the Arena. In addition, face-to-face interactions could create security risks if a patron disagreed with the protester's message. Finally, he testified that enclosing the protesters to the designated areas gives security officers "an easier time with crowd control." App. 287. He explained it would be difficult to monitor the protesters if they were allowed free access to the concourse, and the Authority may need to hire additional guards to ensure protesters are adhering to the policy and to prevent altercations.[11]

---

[11] Sipe testified that, during the circus protests that took place under the terms of the preliminary injunction, he hired

18

In light of this testimony—as well as commonsense inferences about the need to maintain crowd control on the concourse—we conclude the location condition is reasonable. In assessing Defendants' interests, our focus is not only "the disorder that would result from granting an exemption solely to [Plaintiffs]." *Lee*, 505 U.S. at 685 (quoting *Heffron*, 452 U.S. at 652). We must also consider the potentially "much larger threat to [Defendants'] interest in crowd control if all other [protest groups] could likewise move freely." *Id.* (quoting *Heffron*, 452 U.S. at 653). Here, especially considering the concourse's limited purpose of facilitating the movement of Arena patrons between the parking lots and gates, it is sensible for the Arena to maintain a policy that minimizes congestion and interference with the pedestrian flow. *Cf. N.J. Sports*, 691 F.2d at 162 (concluding that "maintaining [pedestrian] traffic and crowd control" justified solicitation ban, as solicitation "impede[s]" the "necessary free movement" of thousands of patrons "mov[ing] rapidly . . . through the parking lot and stadium") (citation omitted). The Arena's related security and safety concerns are also legitimate. It is not unreasonable to anticipate disruption if protesters were allowed throughout the concourse, particularly if a patron is confronted face-to-face by a protester she or he finds aggressive or disagreeable.[12] For

_____

three additional security officers to assist with monitoring the protesters.

[12] Indeed, the video evidence presented at trial showed one minor confrontation between a patron and a protester at a 2016 circus performance. *Pomicter II*, 322 F. Supp. 3d at 565. The patron reacted negatively to the protesters' message and "raised his middle finger to [a] protestor." *Id.* The protesters ignored the incident, and the patron moved along. Pomicter

these reasons, we conclude the location condition is reasonable.

Plaintiffs' counterarguments are unavailing in a nonpublic forum, where our review is limited to reasonableness. Plaintiffs contend that "the availability . . . of other strategies" for addressing crowd control and safety undermines Defendants' explanation. Appellee's Br. 31. While allowing up to 20 protesters access to a limited area of the concourse, as the District Court did, or creating buffer zones, as Plaintiffs suggest, may be less restrictive, Defendants are not required to narrowly tailor speech restrictions in a nonpublic forum. Moreover, Defendants' legitimate concerns about the administrability of these more narrowly tailored restrictions further support the reasonableness of the location condition. *Cf. Cornelius*, 473 U.S. at 809 (approving speech restriction in part "because it would be administratively unmanageable if access could not be curtailed in a reasonable manner"). And although Plaintiffs stress that there is no evidence about past congestion or security problems on the concourse, Defendants do not need to prove that picketing and leafletting would "actually disrupt the intended function of its property." *NAACP*, 834 F.3d at 445 (citation and quotation omitted). Instead, as noted, Defendants are entitled to develop prophylactic policies to avoid these risks rather than react after they occur.

---

also testified that at protests "there's always a few people [who] will say something negative," but she "just ignore[s] it." App. 239. Though we commend Pomicter and her fellow protesters for not engaging with combative patrons, we agree with Sipe's concern that such confrontations have the potential to escalate.

Plaintiffs also contend that the "minimally intrusive nature of leafletting"—as compared to solicitation—distinguishes this case from other cases finding solicitation bans reasonable. Appellees' Br. 27. Plaintiffs rely primarily on *International Society for Krishna Consciousness v. Lee*, where the Supreme Court upheld a solicitation ban but rejected a leafletting ban within airport terminals. 505 U.S. at 685. Justice O'Connor's controlling concurring opinion emphasized that the government had offered no justification at all for banning leafletting separate from banning solicitation. *Id.* at 691 (O'Connor, J., concurring).[13] In the absence of any explanation, the Court could not infer that leafletting—which it recognized was far less disruptive than solicitation—was incompatible with the shopping mall–like "multipurpose environment" of the terminal.[14] *Id.* at 692 (O'Connor, J., concurring). Unlike in *Lee*, here Defendants have directly explained that any protest activity outside the designated areas could cause congestion or safety problems. While solicitation may be more disruptive than picketing and leafletting, we accept that these protest activities may also cause obstruction and congestion. *See N.J. Sports*, 691 F.2d at 161 ("Generally,

---

[13]    As we have previously explained, "Justice O'Connor's concurring opinion in [*Lee*] . . . speak[s] for the Court" as to its holding that the leafletting ban was unconstitutional. *NAACP*, 834 F.3d at 444–45.

[14]    The context for this finding is important. *Lee* was decided in 1992, a time when airport terminals were "generally accessible to the general public." *Lee*, 505 U.S. at 675. At these terminals, members of the public could go to "various commercial establishments such as restaurants, snack stands, bars, newsstands, and stores of various types." *Id.*

the need to maintain public order justifies greater restrictions on active conduct such as picketing . . . .") (citation omitted). The concourse is also a different forum from the airport terminals in *Lee*, which hosted "a wide range of activities" and "extensive, nonforum-related activity." 505 U.S. at 688, 691 (O'Connor, J., concurring). Here, the forum has a single purpose: facilitating the entry and exit of patrons to the Arena. The location condition, intended to minimize any interference with the safe flow of patrons, is closely connected to that purpose. *Cf. Hawkins*, 170 F.3d at 1290–91 (concluding a leafletting ban in a theater entryway is reasonable because of "risk of congestion" and the limited purpose of the forum). Finally, we note Justice O'Connor concluded by stipulating she would find reasonable a policy confining leafletting to a "relatively uncongested part of the airport terminals." *Lee*, 505 U.S. at 692. As this adjustment resembles the "designated areas" used by the Arena, it further supports our decision to uphold the location condition.

Our conclusion that the Arena's location condition is reasonable should not be mistaken to suggest that it is an insignificant burden on speech. Plaintiffs would be on strong footing and may very well prevail were this a public forum, where the narrow tailoring requirement "demand[s] a close fit between ends and means." *McCullen v. Coakley*, 573 U.S. 464, 486 (2014); *see also Turco v. City of Englewood*, --- F.3d ---, 2019 WL 3884456, at *4 (3d Cir. Aug. 19, 2019). But for nonpublic forums the Supreme Court has made clear there is no "requirement that [a] restriction be narrowly tailored." *Cornelius*, 473 U.S. at 809. In these circumstances, because Defendants have met their "light" burden to show the location condition is reasonable in light of the purpose of the concourse, we cannot require more. *See NAACP*, 834 F.3d at 449.

**2.**

We next consider the profanity ban, which specifically prohibits the "[u]se of profanity" by protesters, as well as "[a]ny promotional verbiage suggesting vulgarity or profanity." App. 400. Defendants' justification for this restriction is that "customers of the Arena should not be subjected to profane or vulgar language when attending a sports or entertainment event at the Arena." Appellants' Br. 36; *see also* App. 277. In determining whether the profanity ban is reasonable, we are guided by our opinion in *NAACP*, 834 F.3d 435. As noted, the Philadelphia Airport explained its ban on noncommercial advertising as part of its efforts to create a pleasant environment within the entire Airport. But this explanation was inconsistent with the environment of the Airport; we observed that there was an "onslaught" of noncommercial, controversial content throughout the Airport. *Id.* at 447. Because there was "little logic" to the inference that the city "would devote its advertising space to a purpose to which the rest of the Airport does not subscribe," we concluded the ban on noncommercial advertising alone was not reasonable. *Id.*

We employ the same analysis and reach the same result here. Defendants' explanation for the speech restriction is that they don't believe customers should be subjected to profanity or vulgarity while attending Arena events. To determine if this is a valid restriction, we must consider whether it is consistent with "the atmosphere" at the Arena. *Id.* Defendants admit that the policy applies only to protesters, and there appears to be no similar ban or restrictions for patrons, staff, or others on the concourse. The restriction likewise does not apply within the Arena itself; there is no equivalent ban that applies to

23

performers or athletes that are part of Arena events. Though Defendants' goal may be legitimate, their means of achieving it is not. They cannot meet their goal by singling out protesters on the concourse. Accordingly, like the policy at issue in *NAACP*, we cannot conclude the Arena's internally inconsistent profanity ban, applied exclusively to protesters, is reasonable.

**3.**

Finally, we turn to the artificial voice amplification ban. Defendants offer two explanations for the policy: first, that voice amplification could "interfere" with other activity at the Arena, such as announcements, "commercial vendors present on the premises," or "the event inside the Arena"; and second, that it would "annoy the patrons as they enter and exit the building." Appellants' Br. 35. Because Defendants have not met their burden to establish the ban is reasonable in light of the purpose of the forum, we agree with the District Court that the amplification ban is unconstitutional on this record.

At trial, Sipe briefly testified about the potential interference caused by voice amplification. He said the Arena is "installing" a "sound system . . . that's playing some arena policies for guests." App. 277. In addition, the Arena "sometimes" has shows that sell merchandise outside the Arena, "so any voice amplification that would be louder than theirs would . . . inhibit that sale." App. 276. Finally, amplification "could potentially, if it's loud enough, interfere with what's going on inside the venue." App. 277. This limited testimony appears to be the extent of the record about the Arena's amplification ban. The District Court found that this

24

evidence was not enough to warrant a blanket ban, and instead in its final order allowed the Arena to promulgate a "rule that may restrict protesters from using voice amplification in specified contexts, in order to prevent potential interference with other permitted activities within the Arena." App. 44. We agree with the Court's well-reasoned decision.

Our opinion in *NAACP* makes clear that it is the government's burden to provide a legitimate "explanation as to why certain speech is inconsistent with the intended use of the forum." 834 F.3d at 445 (quoting *Lee*, 505 U.S. at 691–92 (O'Connor, J., concurring)). The explanation must be supported by record evidence, or the record must "contain[] . . . information from which we can draw an inference that would support" the explanation. *Id.* (quoting *Lee*, 505 U.S. at 692 (O'Connor, J., concurring)). Either way, "courts must have some way of evaluating restrictions." *Id.* Here, the brief and equivocal references in Sipe's testimony are not enough to provide a basis for us to assess whether the restrictions are reasonable.

Sipe's description of the Arena's sound system is tentative and vague. Though Defendants can rely on the purposes of the Arena more broadly in explaining speech restrictions, they still must explain how the protected speech would interfere with those purposes. As mentioned, Sipe testified the Arena was "installing" a sound system, which suggests it may not even be operational. And even assuming the sound system is functional, there is no indication where the sound system operates, how often announcements are made, or how loudly the announcements are broadcast. Absent this type of information, which would allow us to understand how voice amplification might disrupt Arena announcements, we are not

willing to infer that amplification "is inconsistent with the intended use of the forum." *Lee*, 505 U.S. at 692 (O'Connor, J., concurring); *see also Kokinda*, 497 U.S. at 732 ("[T]he significance of the governmental interest must be assessed in light of the characteristic nature and function of the particular forum involved.") (quoting *Heffron*, 452 U.S. at 650–51).

Sipe's cursory mention of vendors at the Arena similarly lacks substance. Again, the record lacks enough information to support an inference that amplification is inconsistent with the use of the forum. We are left to guess how often vendors use the concourse, where on the concourse they stand (including the proximity to the designated areas), and whether they even use voice amplification in making sales. And in any event, to the extent Sipe's testimony is that artificial voice amplification is permitted for vendors but prohibited for protesters, we again run into the problem of the Arena's policies being applied unevenly against protesters. If Defendants are concerned about amplification interfering with Arena announcements, we do not see how permitting vendors to use amplification is consistent with that purpose. *See NAACP*, 834 F.3d at 447.

Moreover, if there is an operational sound system playing policies for guests or vendors that use the concourse, the District Court's injunction allows the Authority to enforce a policy that "restrict[s] protesters from using voice amplification in specified contexts, in order to prevent potential interference with other permitted activities within the Arena." App. 44. We hold that Defendants' interests are

26

sufficiently protected by the Court's order.[15] The terms of the injunction also mitigate any potential concern about interference with events going on inside the Arena. The Authority could, for example, prohibit amplification during (as opposed to before and after) performances, which would easily and effectively address this concern.[16]

Defendants finally contend that banning voice amplification is necessary to avoid annoying patrons of the Arena. Unlike the other explanations, we find no mention of this explanation in the record.[17] Compounding the lack of record support, Defendants do not even attempt to explain the connection to the forum. They do not suggest that any hypothetical annoyance would have repercussions for the flow of pedestrian traffic or otherwise disturb the functioning of the Arena. Though amplification may be annoying, absent any connection to the purpose of the forum, this alone is insufficient to justify the speech restriction. And in *NAACP* we explained that "controversy avoidance" as a governmental

---

[15]   We note that at oral argument, counsel for Defendants could not think of a situation in which the Court's order would interfere with the Arena's functioning or be problematic to administer. Oral Arg. Recording at 6:45–7:53.

[16]   The Authority could, alternatively, promulgate a policy that sets a certain decibel limit for any amplification. Such a restriction would be less prohibitive and allow the protesters' message to reach a larger audience across the concourse, while avoiding any potential interference with Arena activity.

[17]   As far as we can tell from our review of the appendix, this rationale was not raised at all during the trial and the District Court therefore did not address it in concluding the amplification ban was not reasonable.

objective is "nebulous and not susceptible to objective verification." 834 F.3d at 446. While it may sometimes be a valid governmental objective, we cautioned against "readily drawing inferences, in the absence of evidence, that controversy avoidance renders [a] ban constitutional." *Id.* (citing *Cornelius*, 473 U.S. at 812). Here, faced with a lack of record support demonstrating the justification for the ban or connection to the forum, we will not make inferences to fill the gaps and accordingly conclude the amplification ban is unreasonable.

## IV.

In sum, we conclude that the Arena's policy sequestering protesters to designated areas satisfies the reasonableness test for speech restrictions in nonpublic forums. Accordingly, we will reverse the District Court's order on this issue and remand for the Court to consider whether the policy passes muster under the Pennsylvania Constitution. Although we reach this conclusion here, we again emphasize that under other circumstances, if the nature of the forum were to change, our analysis would be different. With respect to the Arena's protest policies banning profanity and artificial voice amplification, however, we agree with the District Court that Defendants have not met their burden to show that these restrictions are reasonable in light of the purpose of the forum, and we will therefore affirm.